UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARY KRASSICK, individually and on
behalf of others similarly situated,

    Plaintiffs,                                        Case No. 2:21-cv-180

v.                                                       Hon. Hala Y. Jarbou

ARCHAEOLOGICAL INSTITUTE OF
AMERICA,

    Defendant.
_____/

## OPINION

This is a putative class action asserting violations of Michigan's Preservation of Personal Privacy Act (PPPA), Mich. Comp. Laws § 445.1711 (Mar. 30, 1989), et seq. The PPPA prohibits "a person . . . engaged in the business of selling at retail, renting, or lending books or other written materials" from "disclos[ing] to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer." Mich. Comp. Laws § 445.1712. Under the version of the PPPA in effect until July 30, 2016, a person violating the PPPA is "liable in a civil action for damages to the customer," including "[a]ctual damages, . . . damages for emotional distress, or $5,000.00, whichever is greater," as well as "[c]osts and reasonable attorney fees." Mich. Comp. Laws § 445.1715 (Nov. 7, 1989).[1]

Plaintiff Mary Krassick alleges that, sometime before July 30, 2016, she purchased a subscription to *Archaeology* magazine, which is published by Defendant Archaeological Institute

---

[1] The current version allows for recovery of actual damages and reasonable costs and attorney fees; it no longer allows a claimant to recover $5,000.00 in statutory damages.

of America ("AIA").  AIA allegedly gave information that it possessed about Krassick (including her name, address, and the fact that she subscribed to *Archaeology*) to "data aggregators," in violation of the PPPA.  (Compl. ¶¶ 1, 5, ECF No. 1.)  Krassick seeks statutory damages of $5,000.00 for each violation.  And she seeks to represent a class of other Michigan residents who, at any point before July 30, 2016, had similar information about them disclosed by AIA to third parties.

Before the Court is AIA's motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim (ECF No. 11).  For the reasons herein, the Court will deny the motion.

## I. DISMISSAL STANDARD

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary

judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

Similarly, AIA's objection to the Court's subject matter jurisdiction "questions the sufficiency of the [complaint]." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Facial attacks on jurisdiction are reviewed under the same standard as is applied to a Rule 12(b)(6) motion: the Court accepts Krassick's well-pleaded allegations as true and asks whether subject matter jurisdiction exists based on the complaint. *Id.*

## II. ANALYSIS

AIA makes three arguments for dismissal. First, it argues that Krassick's complaint is untimely. Second, it argues that the Court lacks jurisdiction because Krassick lacks standing under Article III of the Constitution to pursue her claim. Third, AIA argues that the PPPA does not apply to AIA. The Court will address the standing argument first.

**A. Standing**

This Court's power "extends only to 'Cases' and 'Controversies[.]'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting U.S. Const., art. III, § 2). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Id.* at 338. There are three elements to standing. Krassick "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [AIA], and (3) that is likely to be redressed by a favorable judicial decision." *Id.* Krassick carries the burden of establishing

those three elements, and at the pleading stage, she must clearly allege facts demonstrating each element. *Id.*

AIA contends that Krassick has not alleged an injury in fact because her claim is based solely on a statutory violation and does not arise out of any personal injury. The Supreme Court "has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) (quoting *Spokeo*, 578 U.S. at 341). "[A]n injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* (emphasis in original).

Krassick responds that her injury is the invasion of her right to privacy in her reading habits, which is a right protected by the PPPA. Where, as here, the harm alleged is intangible, "'it is instructive to consider whether [that harm] has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.'" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 341).

The Court of Appeals for the Sixth Circuit, as well as several district courts, have rejected the argument that AIA raises here. They have concluded that an individual like Krassick has standing to pursue a PPPA claim. In *Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017), the Court of Appeals held that the plaintiff had standing to pursue a PPPA claim because "the violation at issue" involved "the privacy in one's reading materials." *Id.* at 121 (citing *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 627-29 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873-75 (E.D. Mich. 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 437 (S.D.N.Y. 2016)). Moreover, "the right guaranteed by the [PPPA] is similar in kind to other

4

privacy rights that were gradually recognized by American courts over the course of the last century[.]" *Perlin*, 237 F. Supp. 3d at 641. Consequently, the disclosure of an individual's private reading information in violation of the PPPA "is a cognizable injury in fact for purposes of Article III standing." *Coulter-Owens*, 695 F. App'x at 121.

The foregoing cases are persuasive. AIA does not discuss any of them in its briefing. Instead, AIA draws the Court's attention to Krassick's arguments that her claim "does not arise from any 'personal injury' or seek to recover any actual 'damages' for any such 'injuries'"; rather, "her claim arises from Defendant's violations of her statutorily conferred right to be free from unauthorized disclosures of her [private reading information], and seeks to recover the statutorily authorized sum of $5,000 for each of Defendant's statutory violations[.]" (Pl.'s Resp. Br. 21, ECF No. 19.) However, AIA takes these statements out of context. Krassick made them when arguing that the six-year period of limitation in Mich. Comp. Laws § 600.5813 should apply to her claim, rather than the three-year period of limitation in Mich. Comp. Laws § 600.5805(2) for "injury to persons or property." (*Id.*) As another court recognized, AIA's argument is a "strawman" because Michigan's statute of limitations is not jurisdictional. *Pratt v. KSE Sportsman Media, Inc.*, No. 1:21-CV-11404, 2022 WL 469075, at *8 (E.D. Mich. Feb. 15, 2022). In other words, Krassick contends that Mich. Comp. Laws § 600.5813 supplies the correct limitation period because her right to recovery derives from a statute rather than from a tort for personal injury. That argument does not deprive her of standing. Nor does her choice to seek statutory damages rather than actual damages. Regardless of the form of relief that Krassick seeks, the disclosure of her private information is a concrete injury in fact that gives her Article III standing to bring a PPPA claim.

### B. Statute of Limitations

Next, AIA argues that Krassick's claim is untimely. AIA argues that the three-year statute of limitations in Mich. Comp. Laws § 600.5805(2) applies to this case because Krassick ostensibly

5

seeks to recover damages for "injury to a person or property." *See id.* Krassick brought this case in 2021, approximately five years after the events giving rise to her case occurred. Consequently, her claim would be untimely under a three-year limitation period.

As indicated above, Krassick argues that the appropriate statute of limitations is found in § 600.5813, which is a catch-all provision for "[a]ll other personal actions . . . unless a different period is stated in the statutes." Mich. Comp. Laws § 600.5813. The limitation period in § 5813 is six years, rather than three. *Id.* Michigan courts have not decided which limitation period applies to the PPPA.

Krassick relies on *Palmer Park Square, LLC v. Scottsdale Insurance Co.*, 878 F.3d 530 (6th Cir. 2017), in which the Court of Appeals for the Sixth Circuit noted that "§ 600.5813 applies to *statutory* causes of action, including those for civil fines." *Id.* at 540 (emphasis added). Similarly, the Michigan Court of Appeals has stated that "a civil cause of action arising from a *statutory* violation is subject to the six-year limitation period found in § 5813, if the statute itself does not provide a limitation period." *DiPonio Constr. Co. v. Rosati Masonry Co.*, 631 N.W.2d 59, 66 (Mich. Ct. App. 2001) (emphasis added); *accord Bowman v. Greene*, No. 308282, 2013 WL 5925995, at *6 (Mich. Ct. App. Nov. 5, 2013) (applying § 5813 to the Seller's Disclosure Act, Mich. Comp. Laws § 565.951 et seq.). Here, Krassick's cause of action arises from a violation of the PPPA, which does not provide a limitation period.

The decisions in *Palmer Park* and *Diponio Construction* stem from the Michigan Supreme Court's decision in *Citizens for Pretrial Justice v. Goldfarb*, 327 N.W.2d 910 (Mich. 1982).[2] There, the plaintiffs alleged that the defendant had overcharged them, in violation of various bail

---

[2] In *DiPonio Construction*, the Michigan Court of Appeals cited *Goldfarb* as the basis for its decision. In *Palmer Park*, the Court of Appeals for the Sixth Circuit cited *DiPonio Construction* to support its decision.

bond statutes. The court considered whether the overcharge claim was subject to § 5805 or § 5813 and concluded that the latter applied because § 5805 "applies to traditional, primarily common-law torts," and the "injury complained of" by the plaintiffs "is not a traditional tort." *Id.* at 915; *see Miller-Davis Co. v. Ahrens Constr., Inc.*, 802 N.W.2d 33, 38 (Mich. 2011) ("[A]ll subsections of § 5805 are geared toward tort actions.").

Similarly, Krassick's injury to her right to privacy in her reading materials is not a traditional common-law tort. Although such a right is "similar in kind" to rights protected by the common-law tort of invasion of privacy, the right to privacy in one's reading materials is nonetheless the creation of a statute; it did not exist under common law. *See Perlin*, 237 F. Supp. 3d at 640 (noting that "[w]hen the Michigan legislature enacted the [PPPA], [it] created a new right to privacy"). Accordingly, because "[Krassick's] injury was not the result of a traditional tort, [her claim] must fall under the residual six-year period of limitation contained in [§ 5813]." *Nat'l Sand, Inc. v. Nagel Constr., Inc.*, 451 N.W.2d 618, 622 (Mich. Ct. App. 1990). Put another way, because Krassick's "right to recovery" "arises from a statute" rather than "a common-law right," the six-year limitation period applies. *See id.* at 622 n.7; *accord Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84, 85-86 (Mich. Ct. App. 2002).

AIA responds that "[§] 5805 is a more specific statute of limitations than § 5813 and therefore controls if applicable[.]" *Local 1064, RWDSU AFL-CIO v. Ernst & Young*, 535 N.W.2d 187, 189-90 (Mich. 1995). But AIA's reliance on *Local 1064* is misplaced because that court expressly stated that "§ 5805 prescribes the limitation periods for traditional common-law torts[.]" *Id.* at 190. Also, in *Local 1064*, there was no question that the malpractice claim at issue was a common-law tort, so the court did not consider whether *Goldfarb* and *National Sand* would require

7

a different result for a statutory claim like the one here. In contrast, a violation of the privacy right protected by the PPPA is not a traditional common-law tort, so § 5805 does not apply.

AIA urges the Court to use a test described by the Michigan Court of Appeals in a decision that predates *Goldfarb*. In *Stringer v. Board of Trustees of Edward W. Sparrow Hospital*, 233 N.W.2d 698 (Mich. Ct. App. 1975), the Court of Appeals opined that § 5805 is meant to encompass "injuries resulting from invasions of rights that inhere in man as a rational being, that is, rights to which one is entitled by reason of being a person in the eyes of the law." *Id.* at 700. Such rights are different from those "which accrue to an individual by reason of some peculiar status or by virtue of an interest created by contract or property." *Id.* at 700-01. The right to privacy is arguably one that "inheres in a [person] as a rational being," so under *Stringer*, a violation of that privacy right would be subject to § 5805 rather than § 5813.

The problem with AIA's argument is that it is nearly identical to one adopted by the Michigan Court of Appeals in the *Goldfarb* case. That court held that the plaintiffs' overcharge claim was subject to § 5805 because "the statutory right to be charged no more than ten percent . . . for a bail bond is a right 'to which one is entitled by reason of being a person in the eyes of the law[.]'" *Citizens for Pre-Trial Justice v. Goldfarb*, 278 N.W.2d 653, 660 (Mich. Ct. App. 1979) (quoting *Stringer*, 233 N.W.2d at 700-01). But the Michigan Supreme Court overruled that decision because the plaintiffs' injury was "not a traditional tort." *Goldfarb*, 327 N.W.2d at 915. Thus, AIA's argument is not persuasive.

Similarly, AIA objects that *Palmer Park* and *DiPonio Construction* should be read to apply only where the plaintiff seeks damages under a statute *and does not allege a personal injury*. AIA argues that the plaintiffs in *Palmer Park* and *DiPonio Construction* did not allege a personal injury, so those courts did not consider whether § 5805 might apply. In *Palmer Park*, for instance, the

8

plaintiff sought penalty interest under Mich. Comp. Laws § 500.2006(4). *See Palmer Park*, 878 F.3d at 539. And in *DiPonio Construction*, the plaintiff sought recovery under the builders' trust fund act, Mich. Comp. Laws § 570.152, which protects individuals from fraud in the building construction industry. *DiPonio Constr.*, 631 N.W.2d at 63.

Again, *Goldfarb* undermines AIA's argument. The plaintiffs in that case argued that "claims for statutory overcharges do not involve injuries to persons or property, but instead are claims for pecuniary loss." *Goldfarb*, 327 N.W.2d at 914. The Michigan Supreme Court responded that "[p]ecuniary losses are an element of damages that may flow from an injury to persons or property," and that the plaintiffs had not suffered "an injury to person or property *within the meaning of*" § 5805 because "that statute applies to traditional, primarily common-law torts." *Id.* at 915 (emphasis added). In other words, the court in *Goldfarb* defined "injury to person or property" by reference to traditional, common-law torts, rather than by reference to the type of losses suffered or the remedy sought. Accordingly, like the plaintiffs in *Goldfarb*, Krassick did not suffer a personal injury "within the meaning of" § 5805.

Finally, AIA notes that applying § 5813 to statutory claims with no common-law counterpart is inconsistent with Michigan cases that have applied the three-year limitation period in § 5805 to statutory claims that were not previously recognized by common law. For instance, in *Pompey v. General Motors Corp.*, 189 N.W.2d 243 (Mich. 1971), the Michigan Supreme Court stated that "there was no pre-existent common law remedy for racial discrimination in private employment" before the Fair Employment Practices Act. *Id.* at 251. Nevertheless, according to AIA, Michigan courts have applied the three-year limitation period in § 5805 for "statutory employment claims." (Def.'s Br. 9, ECF No. 33.) Similarly, in *In re Olney's Estate*, 14 N.W.2d 574 (Mich. 1944), one justice of the Michigan Supreme Court observed that "there was no civil

9

cause of action" for wrongful death before the "death act." *Id.* at 577 (Sharpe, J., dissent). Nevertheless, AIA contends that Michigan courts have applied the three-year statute of limitations to wrongful death claims.

AIA does not support its argument with decisions in which a Michigan court considered whether § 5813 might apply to such statutory claims in light of *Goldfarb*, *National Sand*, and the other opinions mentioned above. And in any case, Michigan courts recognize that this area of the law is rife with inconsistency, particularly when one attempts to reconcile newer cases with much older ones. *See Nat'l Sand*, 451 N.W.2d at 625 ("[T]he determination of when to apply § 5805 rather than § 5813 has produced a great deal of confusion and the case law is difficult, if not impossible, to harmonize.").

In summary, *Palmer Park*, *DiPonio Construction, Goldfarb*, and *National Sand* indicate that where, as here, "a statutory cause of action does not define a statute of limitations and the cause of action does not have a traditional common-law counterpart, the statute of limitations is governed by § 5813." *Purnell v. Arrow Fin. Servs., LLC*, No. 05-CV-73384, 2009 WL 1508340, at *2 (E.D. Mich. May 29, 2009). This Court is satisfied that these decisions provide the best evidence of how a Michigan court would rule on the issue if faced with the question today. Accordingly, the six-year statute of limitations in Mich. Comp. Laws § 600.5813 governs a PPPA claim. *See Pratt*, 2022 WL 469075, at *7 (reaching the same conclusion). Consequently, Krassick's action is timely.

### C. Applying the PPPA to AIA

AIA further argues that the PPPA does not apply here because that statute governs "a person . . . *engaged in the business of* selling at retail, renting, or lending books or other written materials." Mich. Comp. Laws § 445.1712 (emphasis added). AIA contends that a "person engaged in the business" refers to a person operating with a profit motive. AIA is a nonprofit

10

entity established by Congressional charter. Because AIA did not have a profit motive, it contends that it was not subject to the PPPA.

Michigan courts have not examined whether the PPPA applies to nonprofit organizations, so the Court begins with the language of the statute itself, resorting to dictionary definitions to determine its plain and ordinary meaning. *People v. Wood*, 954 N.W.2d 494, 499 (Mich. 2020).

### 1. Dictionary Definitions

Black's Law Dictionary defines "business" as (1) "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain"; (2) "[c]ommercial enterprises"; or (3) "[c]ommercial transactions." *Business*, Black's Law Dictionary (11th ed. 2019). It defines "doing business" as "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit, or otherwise accomplishing a goal[.]" *Doing Business*, Black's Law Dictionary (11th ed. 2019).

The Merriam-Webster Dictionary defines "business" as "a usually commercial or mercantile activity engaged in as a means of livelihood" or "dealings or transactions of an economic nature." *Business*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/business.

Some common concepts emerge from these definitions. First, conducting business typically involves a regular series of transactions. Second, these transactions generally provide a pecuniary benefit for the business entity. In other words, an isolated transaction probably would not qualify as conducting business, nor would a transaction that held out no possibility for pecuniary gain. Third, such transactions may or may not stem from a profit motive. Some definitions include a profit motive and some do not. Some merely require a motive to obtain a pecuniary benefit or a motive to sustain the "livelihood," or existence, of the enterprise. *See*

11

*Livelihood*, Black's Law Dictionary (11th ed. 2019) (defining "livelihood" as "[a] means of supporting of one's existence").

### 2. Federal Precedent

AIA cites cases in which federal courts have interpreted the phrase "engaged in the business of" in federal statutes. For instance, in *United States v. Day*, 476 F.2d 562 (6th Cir. 1973), the district court instructed the jury that "engage[d] in the business of . . . dealing in firearms" in the firearms dealer statute, 18 U.S.C. § 922(a), meant the following:

> any business of selling, repairing or pawning firearms and that business is that which occupies the time, attention and labor of the man *for the purpose of livelihood or profit*.

*Day*, 476 F.2d at 567 (emphasis added). The Court of Appeals approved this instruction as "an adequate reflection of the plain meaning of the phrase[.]" *Id.*; *see also United States v. Williams*, 502 F.2d 581, 583 (8th Cir. 1974) (approving a similar instruction); *United States v. Gross*, 451 F.2d 1355, 1357 (7th Cir. 1971) (same). This definition is consistent with the principles discussed above. First, there is the sense of regularity suggested by "that which occupies the time, attention and labor of the man." Second, there is the pecuniary benefit suggested by "the purpose of livelihood or profit."

Another federal appellate court interpreting the same language focused on the "time, attention, and effort" aspect rather than the profit motive. *See United States v. Swinton*, 521 F.2d 1255, 1258 (10th Cir. 1975) (holding that "Section 922(a)(1) does not require that the Government establish that a person engaged in the business of dealing in firearms make a profit, even though the 'dealing' activity requires time, attention and effort.").

In 1986, Congress resolved this circuit split by including "the principal objective of livelihood *and* profit" in a definition of "engaged in the business" in the firearms dealer statute. *See* 18 U.S.C. § 921(a)(21) (emphasis added).

12

Congress did not clarify a similar phrase in the federal explosives statute, which makes it unlawful to "*engage in the business of* importing manufacturing, or dealing in explosive materials without a license[.]" 18 U.S.C. § 842(a)(1) (emphasis added). But the Court of Appeals for the Sixth Circuit has extended its interpretation in *Day* to this statute, requiring a "'purpose of livelihood or profit.'" *United States v. Hamilton*, 689 F.2d 1262, 1271 (6th Cir. 1982) (quoting *Day*, 476 F.2d at 567). The Tenth Circuit, however, has held that this phrase in the explosives statute does not require a profit motive. *See, e.g.*, *United States v. Graham*, 305 F.3d 1094, 1102-03 (10th Cir. 2002) ("[A] person would be 'engage[d] in the business' of dealing in explosives under section 842(a)(1) if he 'take[s] part' in, 'occup[ies] or involve[s him]self,' or is otherwise 'active' in the 'buying and selling' or 'trad[ing]' of explosives in 'commerce' . . . . [T]he intent to profit is not a required element of the offense[.]").

When Congress enacted the Child Protection and Obscenity Enforcement Act of 1988, it "intentionally looked to the definition of 'engaged in the business'" found in the firearms dealer act, but it "eliminated § 921's language requiring a 'princip[al] objective of livelihood and profit.'" *United States v. Skinner*, 25 F.3d 1314, 1318 (6th Cir. 1994). That act applies to persons "*engaged in the business of* producing with intent to distribute or sell" obscene media. 18 U.S.C. § 1466(a) (emphasis added). It defines "engaged in the business" as "devot[ing] time, attention, or labor to such activities, as a regular course of trade or business, with the objective of earning a profit, although it is not necessary that the person make a profit" or that the illegal activity "be the person's sole or principal business or source of income." 18 U.S.C. § 1466(b).

By enacting this definition, "Congress clearly intended to reach 'regular' traffickers who devote time to selling obscene matter but who may only sell or transfer a small amount of obscene materials." *Skinner*, 25 F.3d at 1319. It also wanted to avoid deterring those "'who are legitimate

13

retailers or publishers who might possess on a single occasion items in inventory that are subsequently adjudged obscene.'" *Id.* (quoting Congressional records). Like the updated definition of "engaged in the business" in the firearms dealer statute, this definition requires regular activity and a profit motive.

In summary, when Congress intended "engaged in the business" to require a profit motive, it expressly stated as much. Without an express statement, courts have reached different conclusions about the extent to which a profit motive is necessary. Here, the PPPA does not expressly require a profit motive, which suggests that such a motive might not be necessary.

Furthermore, even the Sixth Circuit's interpretation of "engaged in the business," which ostensibly requires a purpose for "livelihood *or* profit," might apply to AIA to the extent that AIA sells magazine subscriptions to support its *livelihood* rather than to obtain a profit.

### 3. Michigan Precedent

In addition to the federal cases cited by the parties, the Court has discovered some Michigan state court decisions that are instructive. For instance, Mich. Comp. Laws § 500.3114(2) governs insurance benefits for a "person who suffers accidental bodily injury while an operator or a passenger of a motor vehicle *operated in the business of* transporting passengers[.]" According to the Michigan Court of Appeals, this phrase can apply to nonprofit entities transporting passengers. *See Ahee v. City of Novi*, No. 341072, 2019 WL 1270646, at *3 (Mich. Ct. App. Mar. 19, 2019). The "relevant inquiries" are:

> (1) whether the transportation of passengers is the primary purpose for which the vehicle is used and (2) whether the transportation of passengers is a primary, as opposed to incidental, component of the overall business or activity of the operator.

*Id.* "Notably absent from [the court's] test is any requirement that the 'business' endeavor be for-profit." *MIC Gen. Ins. Corp v. Mich. Mun. Risk Mgmt. Auth.*, No. 341766, 2018 WL 5276244, at *3 (Mich. Ct. App. Oct. 18, 2018).

In *MIC*, the court concluded that the insured, a government agency, used its vehicle "in the business of" transporting passengers because that was the vehicle's primary purpose and because the transportation of passengers was "a primary and not incidental component" of the insured's mission. *Id.* at *4. The nonprofit status of the agency did not exclude it from the statute.

Similarly, in *Auto-Owners Insurance Co. v. Seils*, 871 N.W.2d 530 (Mich. Ct. App. 2015), the Michigan Court of Appeals examined whether an insurance policy exclusion applied to the insured, a nonprofit entity that sold beer at a three-day fundraising event under a temporary liquor license. *Id.* at 535-36. The policy excluded coverage for liability resulting from intoxication or furnishing alcoholic beverages where the insured is "*in the business of* manufacturing, *selling, serving or furnishing alcoholic beverages*." *Id.* at 536 (emphasis in original). Relying on dictionary definitions of "business" and decisions from other states, the court of appeals concluded that the dispositive issue was *not* the insured's nonprofit status; instead, the court looked to whether the insured sold alcohol on a "regular" or "continuous, ongoing basis." *Id.* at 541-42. Because the insured's alcohol sales in that case were "temporary" and "limited," it was not "in the business of" selling or serving alcohol. *Id.* at 542.

In summary, Michigan courts examining "in the business of" language similar to that found in the PPPA have concluded that it can apply to nonprofit entities, particularly where those entities are engaged in relevant transactions on a regular basis.

### 4. Application to AIA

Applying the foregoing concepts to the allegations in Krassick's complaint, AIA satisfies the definition of engaging in the business of selling media at retail. The Court can infer from those allegations that AIA regularly sells (or sold) subscriptions to its *Archaeology* magazine because that magazine allegedly has over 150,000 active subscribers. (*See* Compl. ¶ 2.) The Court can also infer that, whether or not AIA's ultimate purpose as an organization was to reap a profit, those

15

sales provided a pecuniary benefit. (*See id.* ¶ 58 (alleging that Krassick paid for her subscription).) Indeed, many nonprofit organizations sell merchandise or other items of value to support their operations. Even if the income from those sales does not exceed the overall expenses of the organization, those sales are nevertheless helpful to sustain the livelihood, or ongoing existence, of the organization. As far as the PPPA is concerned, such an organization would be "engaged in the business of" selling those items. Thus, Krassick states a plausible claim against AIA, even though AIA is a nonprofit entity.

### III. CONCLUSION

For all the foregoing reasons, the Court is not persuaded that dismissal is warranted. Accordingly, the Court will deny AIA's motion.

The Court will enter an order that is consistent with this Opinion.

Dated:  June 9, 2022                                              /s/ Hala Y. Jarbou
                                                                                   HALA Y. JARBOU
                                                                                   UNITED STATES DISTRICT JUDGE